**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CIVIL ACTION NO. 1:23-CV-21771-DPG/EGT**

SUNBELT RENTALS, INC.,
a North Carolina corporation,

         Plaintiff / Counter-defendant,

v.

ACTION RENTALS HOLDINGS, LLC, a Florida limited liability company; ACTION EQUIPMENT HOLDINGS, LLC, a Delaware limited liability company; ACTION RENTALS TRENCH, SHORING, & SUPPLY, LLC, a Florida limited liability company; ACTION FUEL & LUBE, LLC, a Florida limited liability company; ACTION FUEL & LUBE CENTRAL FLORIDA 2, LLC, a Florida limited liability company; ACTION FUEL & LUBE NORTH FLORIDA 2, LLC, a Florida limited liability company; ACTION RENTALS ATL, LLC, a Georgia limited liability company; ACTION RENTALS MSY, LLC, a Louisiana limited liability company; ACTION RENTALS SAV, LLC, a Georgia limited liability company; ACTION RENTALS VPC, LLC, a Georgia limited liability company; ACTION EQUIPMENT SERVICE, LLC, a Florida limited liability company; ACTION RENTALS FLL, LLC, a Florida limited liability company; ACTION RENTALS HST, LLC, a Florida limited liability company; ACTION RENTALS JAX, LLC, a Florida limited liability company; ACTION RENTALS MIA, LLC, a Florida limited liability company; ACTION RENTALS MCO, LLC, a Florida limited liability company; ACTION RENTALS MTH, LLC, a Florida limited liability company; ACTION RENTALS PNS, LLC, a Florida limited liability company; ACTION RENTALS RSW, LLC, a Florida limited liability company; ACTION RENTALS TPA, LLC, a Florida limited liability company; ACTION RENTALS VRB, LLC, a Florida

limited liability company; ACTION RENTALS
WPB, LLC, a Florida limited liability company;
and BRUNO RAMOS,

              Defendants / Counter-claimants.

**DEFENDANTS' / COUNTER-CLAIMANTS' OPPOSITION TO PLAINTIFF'S /
COUNTER-DEFENDANT'S RENEWED MOTION TO COMPEL ARBITRATION AND
TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION ....................................................................................................... 1

II.     BACKGROUND ......................................................................................................... 3

        A.     The APA and the Earnout Provisions ...................................................... 3

        B.     Sunbelt's Breaches of the APA Regarding the Earnout ......................... 4

        C.     The Closing Statement ............................................................................. 6

        D.     Unreimbursed Post-Closing Expenses .................................................... 6

III.    ARGUMENT .............................................................................................................. 7

        A.     Counterclaims I-III Are Outside the Scope of the APA's Limited
             Accountant-Arbitration Clause ............................................................... 7

             1.     The Relevant Law ...................................................................... 7

             2.     The Plain Text Limits Arbitration to Accounting Disputes over
                  Proposed Adjustments to the Final Revenue Calculation.......................... 8

             3.     Numerous Courts of Appeals and District Courts Are In Accord .............. 9

             4.     Sunbelt's Reliance on *Ivax* Ignores the Text of the Arbitration
                  Clauses ...................................................................................... 11

             5.     Counterclaims I and II Are Not Arbitrable ............................... 13

             6.     Counterclaim III Is Not Arbitrable .......................................... 15

        B.     Counterclaim IV Is Not Moot ................................................................. 16

        C.     Counterclaim V Is Adequately Pled and Not Precluded by the APA .................. 17

             1.     The Allegations Satisfy the *Iqbal* Standard .............................. 17

             2.     The APA Does Not Cover All Unreimbursed Expenses .......................... 18

IV.    CONCLUSION.......................................................................................................... 19

CERTIFICATE OF SERVICE ........................................................................................... 21

SERVICE LIST ................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................17, 18

*BBCM, Inc. v. Health Sys. Int'l, LLC*,
   C10-0086, 2010 WL 4607917 (N.D. Iowa Nov. 4, 2010),
   *report and recommendation adopted*, 2010 WL 5418892
   (N.D. Iowa Dec. 23, 2010)..........................................................................................15

*Bennett v. Sys. & Servs. Techs., Inc.*,
   2:21-CV-770, 2022 WL 1470318 (M.D. Fla. May 10, 2022) .................................13

*Bratt Enters., Inc. v. Noble Int'l Ltd.*,
   388 F.3d 609 (6th Cir. 2003) ...................................................................................11

*Brewer–Giorgio v. Producers Video, Inc.*,
   216 F.3d 1281 (11th Cir. 2000) ...............................................................................19

*Calderon v. Sixt Rent a Car, LLC*,
   5 F.4th 1204 (11th Cir. 2021) ..........................................................................7, 8, 13

*Clearwater Consulting Concepts, LLP v. Imperial Premium Fin., LLC*,
   CIV 09 81042, 2010 WL 916392 (S.D. Fla. Mar. 11, 2010)....................................18

*Cook v. Bennett*,
   792 F.3d 1294 (11th Cir. 2015) ...............................................................................17

*Doe v. Princess Cruise Lines, Ltd.*,
   657 F.3d 1204 (11th Cir. 2011) ...............................................................................13

*ECB USA, Inc. v. Chubb Ins. Co. of NJ*,
   No. 20-20569-Civ, 2021 WL 9219658 (S.D. Fla. Nov. 15, 2021) ....................16, 17

*Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*,
   374 F.3d 1 (1st Cir. 2004).................................................................10, 11, 14, 15

*Harker's Distrib., Inc. v. Reinhart Foodservice, L.L.C.*,
   597 F. Supp. 2d 926 (N.D. Iowa 2009)......................................................................16

*Hebbronville Lone Star Rentals, L.L.C. v. Sunbelt Rentals Indus. Servs., L.L.C.*,
   898 F.3d 629 (5th Cir. 2018) ...........................................................................9, 10, 15, 16

*Hodges v. MedAssets Net Revenue Sys.*,
    07 Civ. 2985, 2008 WL 476140 (N.D. Ga. Feb. 19, 2008) ...............................................11, 15

*Ivax Corp. v. B. Braun of America, Inc.*,
    286 F.3d 1309 (11th Cir. 2002) .....................................................................2, 11, 12, 13

*Lambert v. Austin Ind.*,
    544 F.3d 1192 (11th Cir. 2008) ................................................................................7

*Orrico v. Alliant Foodservice, Inc.*,
    119 F. App'x 899 (9th Cir. 2004) ..............................................................11, 14, 15

*Paladino v. Avnet Computer Techs., Inc.*,
    134 F.3d 1054 (11th Cir. 1998) ..........................................................................7, 9

*Quantum Supply B.V. v. Mercury Air Cargo Inc.*,
    20-CV-25223, 2021 WL 2414161 (S.D. Fla. June 14, 2021)...........................................18, 19

*Rutledge v. NCL (Bahamas) Ltd.*,
    14-23682-CIV, 2015 WL 458133 (S.D. Fla. Feb. 3, 2015)....................................................13

*Senti v. Sanger Works Factory, Inc.*,
    06 Civ. 1903, 2007 WL 1174076 (M.D. Fla. Apr. 18, 2007) ................................................11

*Virgilio v. Ryland Group, Inc.*,
    680 F.3d 1329 (11th Cir. 2012). Action Rentals....................................................................18

*XL Capital, Ltd. v. Kronenberg*,
    145 F. App'x 384 (2d Cir. 2005) ..........................................................................11, 14

**Statutes**

9 U.S.C. § 3 ...............................................................................................................................1

9 U.S.C. § 4 ...............................................................................................................................1

**Rules**

Fed. R. Civ. P. 8 ...............................................................................................................17, 18

Fed. R. Civ. P. 9 ....................................................................................................................17

Fed. R. Civ. P. 12 ....................................................................................................................1

Fed. R. Civ. P. 15 ..................................................................................................................19

Defendants / Counter-claimants[1] respectfully file this memorandum in opposition to the Renewed Motion to Compel Arbitration Under 9 U.S.C. §§ 3, 4 and to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), (D.E. 40 (the "Renewed Motion to Compel Arbitration" or "Renewed Mot.")), filed by Plaintiff / Counter-defendant Sunbelt Rentals, Inc. ("Sunbelt" or "Buyer"). For the reasons that follow, the motion should be denied.

## I.     INTRODUCTION

The Counterclaims[2] arise out of Action Rentals' sale of its rights and assets in its construction equipment rental businesses to Sunbelt. (D.E. 39, Section III.) Counterclaims I-III pertain to provisions of the governing Asset Purchase Agreement (D.E. 39, Ex. A (the "APA")) that require Sunbelt (as buyer) to make additional payments to Action Rentals (as sellers) if the acquired businesses meet certain revenue benchmarks. These provisions—commonly called "earnouts"—incentivize sellers to support the sold businesses after the transition. In the event that Action Rentals disputed Sunbelt's revenue calculations, the APA requires the parties to submit Action Rentals' "proposed adjustments" to an accountant to arbitrate the dispute.

Sunbelt argues that Counterclaims I-III must be arbitrated simply because they are related to the earnout provisions, but neither the text of the APA nor the case law supports this argument. This Court must look to "the plain language of the arbitration provision and contract itself" to define the scope of an arbitration provision. Here, the APA's plain language limits arbitration to disputes over "proposed adjustments," *i.e.*, financial adjustments, to a revenue

---

[1] "Defendants," "Counter-claimants," "Sellers," and "Action Rentals" refer to, collectively, Action Rentals Holdings, LLC, Action Equipment Holdings, LLC, Action Rentals Trench, Shoring & Supply, LLC, Action Fuel & Lube, LLC, Action Fuel & Lube Central Florida 2, LLC, Action Fuel & Lube North Florida 2, LLC, Action Rentals ATL, LLC, Action Rentals MSY, LLC, Action Rentals SAV, LLC, Action Equipment Service, LLC, Action Rentals FLL, LLC, Action Rentals HST, LLC, Action Rentals JAX, LLC, Action Rentals MIA, LLC, Action Rentals MCO, LLC, Action Rentals MTH, LLC, Action Rentals PNS, LLC, Action Rentals, RSW, LLC, Action Rentals TPA, LLC, Action Rentals VRB, LLC, Action Rentals WPB, LLC, and Bruno Ramos ("Bruno").

[2] References to "Counterclaims" refer to the First Amended Answer to Complaint, Affirmative Defenses, and Counterclaims ("Am. Countercl."). (D.E. 39.)

calculation. That is why the parties put an accountant, rather than a lawyer, in charge of the arbitration. The APA further limits the accountant-arbitrator's remedial powers to "assign[ing] a value," *i.e.*, fixing a dollar amount, to disputed items within limited parameters. Also notable is that there is no preamble to the arbitration clause stating that "all claims arising out of, or related to" the earnout provisions or APA must be arbitrated. In fact, the opposite is true: any disputes outside of the APA's arbitration provisions must be brought in a federal or state court in Florida.

No fewer than five Courts of Appeals——including the Fifth Circuit addressing a similar Sunbelt asset purchase agreement—and two District Courts in this Circuit have held that accountant-arbitration provisions like the one in the APA are narrow, providing for *accountants* to resolve only *accounting* issues. Those same courts have held that claims for breach of contract, breach of duties of good faith and fair dealing, and for declaratory relief, which is what Action Rentals asserts here, are *outside* the scope of limited accountant-arbitration provisions. The Eleventh Circuit has not considered an arbitration clause like the one at bar, and Sunbelt's reliance on *Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309 (11th Cir. 2002), is misplaced. While *Ivax* compelled arbitration for earnout-related claims, the court's reasoning was, properly, centered on the broad language of the arbitration provision at issue, which covered all "dispute[s]" that the seller "has not been paid amounts due it" under the earnout provisions. That contractual language is determinatively broader than that in the APA here.

Sunbelt's arguments for dismissal are also unavailing. First, Sunbelt contends that Counterclaim IV, which seeks specific performance, is moot because the "first draft" of the Closing Statement that Sunbelt provided to Action Rentals satisfies the APA. Action Rentals disagrees and contends that the APA does not permit draft submissions. This controversy can only be resolved by examining the merits, which cannot be done on a motion to dismiss.

Second, Sunbelt claims that Counterclaim V for unjust enrichment was not adequately pled and is precluded by the APA. Counterclaim V adequately pleads the elements of an unjust

enrichment claim and satisfies *Iqbal*'s low-bar "plausibility" requirement. Furthermore, the APA does not preclude Counterclaim V because most of the post-closing expenses at issue are not covered by the APA. Action Rentals agrees that the APA covers *a subset* of the pleaded unreimbursed expenses, and respectfully requests leave to amend Counterclaim V to remove allegations related to rent and utilities and to re-plead them as a breach of contract claim.[3]

## II.    BACKGROUND

### A.    The APA and the Earnout Provisions

Action Rentals sold its rights and assets to Sunbelt pursuant to the APA dated October 1, 2021. (Am. Countercl. ¶¶ 2-3.) In addition to the initial purchase price, the APA provided for Sunbelt to pay Action Rentals an additional $7.5 million earnout payment—what the APA calls a "Contingent Payment Amount"—if the acquired businesses achieved certain revenue benchmarks—what the APA calls the "Contingent Payment Threshold." *(Id.* ¶¶ 50, 54.)

The earnout's revenue benchmarks are tied to Sunbelt's rental revenues (the "Contingent Period Revenues") from specified customers (the "Contingent Payment Customers") during the calendar year (2022) after the transaction (the "Contingent Payment Period"). *(Id.* ¶ 54.) The Contingent Payment Customers were those customers whose business could be attributed to Action Rentals, specifically, a set of Action Rentals' pre-existing customers listed on Schedule 3.4(a)(ii) of the APA (the "Contingent Payment Customer List"), and any new customers brought to Sunbelt by Bruno or Action Rentals' former employees ("New Customers"). *(Id.* ¶ 55.) The Contingent Payment Threshold is specified in the Contingent Payment Customer List as $35,927,611.03, and was determined by tabulating all of the rental revenues Action Rentals and Sunbelt earned from the listed customers during the year prior to the transaction. *(Id.* ¶¶ 56-57.)

If Sunbelt's Contingent Period Revenues met or exceeded the Contingent Payment Threshold, Sunbelt is required to pay Action Rentals the full Contingent Payment Amount of

---

[3] Throughout this brief, emphasis is added and internal citations, quotation marks, and alterations omitted unless otherwise indicated.

$7.5 million. A sliding scale of payments applies if Contingent Period Revenues were between 91% and 99.99%. Anything less than 91% and no payment is due. (*Id.* ¶ 58.)

Because the ability to generate earnout revenues, and information about those revenues, is in Sunbelt's (and not Action Rentals') hands, the APA imposes various obligations on Sunbelt's operation of the businesses and provision of relevant information to Action Rentals. First, during the Contingent Payment Period, Sunbelt is required to "in good faith continue to provide rental services to the Contingent Payment Customers." *(Id.* ¶ 59.)

Second, Sunbelt is prohibited from "tak[ing] any action that is primarily intended to prevent or frustrate the achievement of Contingent Payment Revenues . . . being equal to or greater than the Contingent Payment Threshold." *(Id.* ¶ 59.)

Third, after the conclusion of the Contingent Payment Period, Sunbelt is required to provide Action Rentals with "a statement setting forth in reasonable detail the Contingent Period Revenues for the entire Contingent Payment Period (the 'Final Revenue Calculation')." *(Id.* ¶ 60.) After receiving the Final Revenue Calculation, if Bruno "believes that the Final Revenue Calculation was not determined correctly or in accordance with the APA," he has 30 days to "describe [to Sunbelt] in reasonable detail any proposed adjustments to the Final Revenue Calculation which Bruno believes should be made and the basis therefor." *(Id.* ¶ 61.)

Fourth, Sunbelt and Action Rentals are then required to "negotiate in good faith to resolve any dispute over the Bruno's [sic] proposed adjustments to the Final Revenue Calculation." *(Id.* ¶ 63.) If they cannot resolve a dispute over Bruno's proposed adjustments to the Final Revenue Calculation, then the parties "jointly will select . . . an Accounting Firm to resolve by arbitration any remaining dispute over Bruno's proposed adjustments." *(Id.* ¶¶ 64-65.)

### B.    Sunbelt's Breaches of the APA Regarding the Earnout

Sunbelt breached its earnout obligations in multiple ways, including by failing to provide rental services to certain customers; by engaging in a duplicitous cat-and-mouse game in which

Sunbelt repeatedly generated only partial and misleading information regarding the Contingent Period Revenues; and by attempting to impose a new and unjustifiably inflated Contingent Payment Threshold to deny Action Rentals' entitlement to an earnout payment.

Following the Contingent Payment Period, Sunbelt initially provided Action Rentals with a purported Final Revenue Calculation of $28,381,670, which would result in no earnout payment. *(Id.* ¶ 69.) However, after Bruno repeatedly pressed Sunbelt on the accuracy and completeness of its tabulation, Sunbelt twice revised its calculation, revealing an *additional $4.9 million* in previously undisclosed revenues. Sunbelt first conceded that it identified over $3 million of additional revenues for 11 customers who had multiple accounts. *(Id.* ¶ 71.) Sunbelt then conceded that it had not counted revenues for *any New Customers*, and that Sunbelt had identified 413 New Customers and over $1.8 million in additional revenues. *(Id.* ¶ 73.)

Sunbelt thus has now conceded Contingent Period Revenues of $33,313,874, which is $92.72% of the Contingent Payment Threshold of $35,927,611.03 and obligates Sunbelt to pay an earnout of $1.5 million. *(Id.* ¶ 74.) Nevertheless, Sunbelt has not paid Action Rentals any earnout. *(Id.* ¶ 75.) Instead, Sunbelt has attempted to move the goal posts by claiming that the Contingent Payment Threshold should be raised by over $5.4 million, to a total of $41,331,593, to again put Action Rentals out of the money. *(Id.* ¶¶ 107-10.)

Furthermore, Sunbelt continues to fail to disclose all of the revenues that should be tabulated. First, Sunbelt has not identified and disclosed all revenues from New Customers because Sunbelt has not linked all New Customer accounts in Sunbelt's computer system to Action Rentals' former employees who brought in those New Customers. *(Id.* ¶¶ 55, 76-78.) Second, Sunbelt has underreported at least $5.2 million in rental revenues from at least seven preexisting customers, likely, in part, because Sunbelt has not identified and tabulated the rental revenues of all customers with multiple accounts. *(Id.* ¶¶ 79-80, 84.)

In addition, Sunbelt provided no rental services to 23 Contingent Payment Customers. Those same customers generated over $2 million in revenues during the year prior to the transaction, and thus likely could have generated significant revenues during the Contingent Payment Period. (*Id.* ¶¶ 97-98.) But Sunbelt undermined that business opportunity by placing a hold or other rental restriction on at least some of those customers' accounts. (*Id.* ¶¶ 96, 99.)

### C.     The Closing Statement

Apart from the earnout, the APA also provides for a "Purchase Price Adjustment" that modifies the initial purchase price based on the assets and liabilities of the acquired businesses at the time the transaction closed. (*Id.* ¶ 115.) To determine the amount of the adjustment, the APA requires Sunbelt to deliver to Action Rentals a "Closing Statement" setting forth the various components of the Purchase Price Adjustment within 60 days of the closing, which took place on October 22, 2021. (*Id.* ¶¶ 114, 116.) Similar to the earnout procedure, Action Rentals then has the opportunity to dispute and propose adjustments to the Closing Statement, the parties then must negotiate in good faith to resolve any disputes, and in the event of an unresolved disagreement, the proposed adjustments are submitted to an accountant-arbitrator. (*Id.* ¶¶ 117-123.) However, Sunbelt failed to deliver the Closing Statement within 60 days after the closing, and on December 23, 2021, Sunbelt sent to Action Rentals a supposed "first draft" of the Closing Statement, which is not permitted by the APA and which impeded Action Rentals' ability to challenge and propose any adjustments to the Closing Statement. (*Id.* ¶¶ 124-129.)

### D.     Unreimbursed Post-Closing Expenses

After the transaction closed, Action Rentals paid various expenses on Sunbelt's behalf to ensure a smooth transition. These expenses were related to property taxes, security services, utilities, rent, mailing costs, and various other business expenses, and totaled $1,381,569.77. Sunbelt has not reimbursed Action Rentals for these expenses. (*Id.* ¶¶ 130-131.)

III.     **ARGUMENT**

A.     **Counterclaims I-III Are Outside the Scope of the APA's Limited Accountant-Arbitration Clause**

Action Rentals does not dispute that Section 3.4 of the APA contains a valid accountant-arbitration provision, and does not contend, as Sunbelt claims, that this Court should not enforce it merely because it would be "unfair." (Renewed Mot. at 10-12.) Rather, Sunbelt's motion should be denied because the APA's accountant-arbitration provision is narrowly drawn—it is limited to adjudicating "proposed adjustments," *i.e.*, financial adjustments, to the Final Revenue Calculation, which itself is a spreadsheet detailing rental revenues. Counterclaims I-III, however, do not attempt to litigate "proposed adjustments" to the Final Revenue Calculation.

1.     **The Relevant Law**

A party seeking to compel arbitration under the Federal Arbitration Act ("FAA") must demonstrate that "(a) the plaintiff entered into a written arbitration agreement that is enforceable under ordinary state-law contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). "Under Florida law, the meaning of an arbitration provision is a matter of contractual interpretation and thus turns on the intent of the parties to the contract, as manifested in the plain language of the arbitration provision and contract itself." *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1208 (11th Cir. 2021). "The FAA does not require parties to arbitrate when they have not agreed to do so, nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement." *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1057 (11th Cir. 1998). The presumption in favor of arbitration notwithstanding, "the courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." *Id*.

**2.      The Plain Text Limits Arbitration to Accounting Disputes over Proposed Adjustments to the Final Revenue Calculation**

Sunbelt contends that because Counterclaims I-III "all relate to the Final Revenue Calculation," they are subject to arbitration by an accountant. (Renewed Mot. at 6-7.) This argument fails because "the plain language of the arbitration provision and contract itself"—the lodestar for determining the scope of an arbitration clause—does not support Sunbelt's expansive interpretation. *Calderon*, 5 F.4th at 1208. In fact, Sunbelt all but ignores the text of the accountant-arbitration provision.

The accountant-arbitration provision at issue provides, in relevant part, that,

(c) Buyer will prepare and deliver to Bruno . . . within the thirty (30) days following the end of the Contingent Payment Period, a statement setting forth in reasonable detail the Contingent Period Revenues for the entire Contingent Payment Period (the "Final Revenue Calculation"). Within the thirty (30) day period after Buyer's delivery of the Final Revenue Calculation, Bruno will, in a notice to Buyer, either accept the Final Revenue Calculation, or, **in the event that Bruno believes the Final Revenue Calculation was not determined correctly or in accordance with this Agreement, describe in reasonable detail any proposed adjustments to the Final Revenue Calculation which Bruno believes should be made and the basis therefor**. . . .

(d) Buyer and Bruno will negotiate in good faith to resolve **any dispute over the Bruno's proposed adjustments to the Final Revenue Calculation**, provided that if any such dispute is not resolved within thirty (30) days following receipt by Buyer of Bruno's proposed adjustments, Buyer and Bruno jointly will select . . . an Accounting Firm **to resolve by arbitration any remaining dispute over Bruno's proposed adjustments**. Buyer and Bruno will direct the Accounting Firm to resolve the items in dispute and render a written report on the resolved disputed items (and only on those disputed items) within thirty (30) days after the date on which it is engaged or as soon thereafter as possible. In resolving any disputed item, the Accounting Firm may not assign a value to any item greater than the greatest value for such item claimed by Buyer or Bruno or less than the smallest value for such item claimed by Buyer or Bruno.

(APA §§ 3.4(c)-(d).)

This is an unambiguously narrow arbitration clause. The accountant-arbitrator's authority is circumscribed to merely resolving "any remaining dispute over Bruno's proposed adjustments" after the parties have attempted to resolve those disagreements. The accountant-

8

arbitrator's role is further limited to "assign[ing] a value," *i.e.*, fixing a dollar amount, to disputed items within limited parameters. (APA§ 3.4(d).)

Notably, the accountant-arbitration clause is *not* introduced by language mandating arbitration for "all claims arising out of, or related to" the earnout (or words to that effect). Nor does the accountant-arbitration clause "broadly" cover "any dispute" related to the Contingent Payment, as Sunbelt selectively quotes. (Renewed Mot. at 6.) Instead, the parties agreed to limit the accountant-arbitrator's authority to resolving computational disputes about only "Bruno's proposed adjustments" that the parties could not resolve. In addition, the parties expressly agreed that any disputes outside of the APA's arbitration provisions must be submitted to a federal or state court in Florida. (APA § 11.10.) That provision demonstrates that the parties did not intend for the accountant-arbitrator provision to cover every conceivable dispute that touches upon the earnout. *See, e.g.*, *Paladino*, 134 F.3d at 1057 ("The FAA does not . . . prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement.").

### 3.     Numerous Courts of Appeals and District Courts Are In Accord

Numerous Courts of Appeals and District Courts in this Circuit interpreting similarly worded accountant-arbitration clauses in asset purchase agreements with earnout provisions have held that arbitration is limited to *accounting* disputes related to tabulating earnout revenues. Indeed, the Fifth Circuit so held in relation to a prior Sunbelt asset purchase agreement.

In 2014, Hebbronville Lone Star Rentals L.L.C. ("Lone Star") sold its assets, customer lists, and customer contracts to Sunbelt. *See Hebbronville Lone Star Rentals, L.L.C. v. Sunbelt Rentals Indus. Servs., L.L.C.*, 898 F.3d 629, 630 (5th Cir. 2018). The asset purchase agreement included a contingent payment provision. *Id*. As part of the calculation of earnout revenues, Sunbelt included revenues for a customer named "COG Operating LLC," which amounted to under $55,000, but *did not* include more than $2 million in revenues for the account for customer name "COG Operating, LLC." The *only* difference between the two names was the comma

before "LLC," even though both accounts were for *the same company*. "Sunbelt justified that exclusion on the ground that the asset purchase agreement does not list COG with-a-comma as a Business Customer." *Id.* at 631. Lone Star and Sunbelt submitted the calculation of the earnout revenues to an accountant-arbitrator, who rejected Sunbelt's disingenuous argument that it did not have to give credit for revenues generated by the entity with a comma in its name. *Id.*

However, the arbitrator took the additional step of adjusting the contractually specified contingent payment threshold upwards in the manner sought by Sunbelt. *Id.* at 631-32. The Fifth Circuit ruled that the arbitrator exceeded his authority under the parties' "limited" arbitration agreement. As the court explained, the contract's language provided for the accountant-arbitrator "to resolve only 'any remaining dispute over *Seller's proposed adjustments* to a Revenue Calculation,'" and did not provide for the arbitrator to resolve all disputes "regarding" or "arising out of" the revenue calculation. *Id.* at 633-34 (emphasis in original). The court found its interpretation was reinforced by the separate clause providing that "any disputes not falling within the scope of the [agreement's] arbitration clauses will be resolved in court." *Id.* at 634.

As in *Lone Star*, the APA's accountant-arbitration provision is limited to adjudicating "proposed adjustments" to the Final Revenue Calculation. Additionally, as in *Lone Star*, the APA contains a separate clause reserving all non-arbitral issues to the court system.

This interpretation is also supported by the use of an *accountant* as the arbitrator. In *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, the First Circuit found that using an accountant as arbitrator for disputes concerning a post-acquisition earnout buttressed the interpretation that arbitration was "limited" "to disagreements about *accounting* issues arising in the calculations that underpin the [earnout] schedules." 374 F.3d 1, 8-9 (1st Cir. 2004).[4] The court reasoned:

---

[4] Like the APA, here, the relevant provisions in *Fit Tech* required the seller to notify the buyer of "any objections, and the basis therefore . . . [to] the Earn-Out Schedule . . . [and specify] the amount in dispute," and provided that if the parties "are unable to resolve *any disagreement* with respect to . . . the *Earn-Out Schedule* . . . , then the items in dispute will be referred to the Accountants for final determination." 374 F.3d at 3.

> [I]t makes no sense to assume that accountants would be entrusted with evaluating disputes about the operation of the business in question. Yes, operational misconduct may well affect the level of earnings and therefore the schedules, but . . . [no] one [would] expect accountants to have special competence in deciding whether business misconduct unrelated to accounting conventions was a breach of contract or any implied duty of fair dealing.

*Id.* at 8.

The Second, Sixth, and Ninth Circuits and two District Courts in this Circuit are in accord. The Second Circuit faced a provision requiring arbitration by an accountant of "all questions, issues or disputes arising under this Agreement with respect *to the calculations* of the Earned Payout Amount." *XL Capital, Ltd. v. Kronenberg*, 145 F. App'x 384, 385 (2d Cir. 2005). It explained that "the fact that the chosen arbitrator is an accounting firm verifies the import of the plain language: that the scope of the clause is limited to those issues closely related to accounting." *Id.* Likewise, the Ninth Circuit held that arbitration by an "Earnout Auditor" was "limited" to resolving disputes over the "calculation of the proposed earnout amount." *Orrico v. Alliant Foodservice, Inc.*, 119 F. App'x 899, 902 (9th Cir. 2004). So too has the Sixth Circuit held. *See Bratt Enters., Inc. v. Noble Int'l Ltd.*, 388 F.3d 609, 612-13 (6th Cir. 2003) (reversing district court order to compel arbitration and finding that accountant-arbitration provision covered only "disagreements about *the amounts included in* the Closing Balance Sheet"). Two District Courts in this Circuit have also reached the same conclusion.[5]

### 4.    Sunbelt's Reliance on *Ivax* Ignores the Text of the Arbitration Clauses

Sunbelt hangs its argument on the Eleventh Circuit's decision in *Ivax, y*et, incredibly,

---

[5] *See, e.g.*, *Hodges v. MedAssets Net Revenue Sys.*, 07 Civ. 2985, 2008 WL 476140, at *3-4 (N.D. Ga. Feb. 19, 2008) (provision referring "any dispute" over earnout determination to accountant-arbitrator, read "as a coherent whole," pertains only to "disputes concerning the calculation of sales" where the buyer was required to provide seller with a "*schedule* detailing the *calculation*" of the earnout); *Senti v. Sanger Works Factory, Inc.*, 06 Civ. 1903, 2007 WL 1174076, at *2, 6 (M.D. Fla. Apr. 18, 2007) (provision requiring accountant-arbitration of "a dispute or disagreement relating to the Earn-Out" was limited to "issues that accountants are qualified to resolve . . . [involving] the calculation of the correct amounts due (applying generally accepted accounting principles) under the Earn-Out section").

does not bother to discuss the language of the arbitration clause in that case. In *Ivax*, the court parsed the contract language and determined that the "dispute[s]" referred to arbitration included all "disagreements that arise when 'Ivax [the seller] determines that it has not been paid amounts due it'" under the earnout provisions. *Id*. at 1322 (quoting the contract). The court interpreted this broad language to require arbitration for "any assertion by Ivax that Braun should make a contingency payment—regardless of the reasons Ivax may give." *Id*. [6]

The court further explained that the "key" to its conclusion was an adjacent clause giving the arbitrator "the power to use 'whatever procedures and factual investigations' it deems necessary to determine" the contingent payout. *Id*. at 1323 (quoting the contract). The court reasoned that "[s]uch a grant of access would be unnecessary under Ivax's narrow interpretation, which confines the arbitrator to adjudicating disputes over proper [adjusted combined operating income] entries based solely on 'reports from the two parties' accountants.'" *Id*.

Neither pillar supporting the court's opinion in *Ivax* is present here, rendering it an inapposite precedent. *First*, the APA's arbitration provision does not include the all-encompassing language found in *Ivax* that arbitration was required for all "dispute[s]" raised by the seller "that it has not been paid amounts due." Instead, the APA limits arbitration to "dispute[s] over Bruno's proposed adjustments." *Second*, unlike in *Ivax*, the APA does not contain a special grant of authority to the accountant-arbitrator to resolve anything other than accounting-specific disputes, which the *Ivax* court said was "key" to its decision. According to the logic of *Ivax*, that suggests that the parties here did not intend for the accountant-arbitrator to resolve every conceivable controversy touching on the earnout.

---

[6] Indeed, because the arbitration clause was so broad as to encompass *any* claim by Ivax "that it has not been paid amounts due," the court said it was appropriate to consider the "thrust" of Ivax's complaint, not just the alleged causes of action. *Ivax*, 286 F.3d at 1321-22. The thrust, according to the court, was to collect the contingent payment through litigation, which was a no-go because of specific arbitration language in the agreement. *Id*.

The language in the APA controls. "In analyzing the scope of an arbitration clause, we consider how the factual allegations in the complaint match up with the causes of action asserted and measure that against the language of the arbitration clause." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1221 n.13 (11th Cir. 2011). The Court must give effect to the APA's language limiting arbitration to resolving disputes about "Bruno's proposed adjustments to the Final Revenue Calculation." "If the language about [proposed adjustments] did not limit the scope of the arbitration provision, it would have no purpose, and that is an interpretive no-no." *Id.* at 1218; *see id.* (noting the parties could have drafted a broader arbitration clause simply by omitting the limiting language). The presence of a broader arbitration provision than the clause in the APA makes *Ivax* inapplicable. *See Calderon*, 5 F.4th at 1207, 1209-11 (denying motion to compel arbitration based on close reading of contract language "in the light of neighboring provisions and the larger contractual context—and applying a dose of common sense").[7]

In the absence of binding precedent, this Court should look to the myriad of decisions cited herein as persuasive authority.

### 5.     Counterclaims I and II Are Not Arbitrable

The APA's narrow accountant-arbitration provision does not encompass Counterclaims I and II. Action Rentals is not asking this Court to resolve disputes over proposed adjustments to the Final Revenue Calculation, but instead alleges Sunbelt's *conduct* breached contractual provisions of the APA and the covenant of good faith and fair dealing.

Counterclaims I and II allege that Sunbelt violated various provisions in the APA by (*i*) failing, in good faith, to continue to provide rental services to Contingent Payment Customers by

---

[7] *See also Bennett v. Sys. & Servs. Techs., Inc.*, 2:21-CV-770, 2022 WL 1470318, at *4 (M.D. Fla. May 10, 2022) (rejecting party's citation to "cases with broader arbitration provisions" and carefully evaluating the specific words used in the contract); *Rutledge v. NCL (Bahamas) Ltd.*, 14-23682-CIV, 2015 WL 458133, at *5 (S.D. Fla. Feb. 3, 2015) (comparing the arbitration clause language involved in Eleventh Circuit case law to the clause before it to determine if the precedent was applicable).

barring and restricting certain customers from obtaining rental services; (*ii*) taking actions primarily intended to prevent or frustrate the achievement of Contingent Period Revenues meeting or exceeding the Contingent Payment Threshold, by failing to diligently and accurately identify and disclose all rental revenues for all accounts, locations, and subsidiaries of Sunbelt for all Contingent Payment Customers (including New Customers); (*iii*) failing to provide Action Rentals with a Final Revenue Calculation setting forth the Contingent Period Revenues in reasonable detail by repeatedly providing incomplete and inaccurate calculations and without sufficient information for Action Rentals to exercise their contractual rights to dispute and propose adjustments to Sunbelt's calculations; (*iv*) failing to negotiate in good faith to resolve disputes over the Final Revenue Calculation by repeatedly providing incomplete and inaccurate calculations and without sufficient information for Action Rentals to exercise their contractual rights to dispute and propose adjustments to Sunbelt's calculations; and (*v*) failing to pay Action Rentals the Contingent Payment Amount owed in accordance with the APA's specified Contingent Payment Threshold. (Am. Countercl. ¶¶ 138-39, 149-50.)

Sunbelt's failure to provide rental services to certain customers as contractually required, for example, is not an accounting dispute or a dispute about a proposed adjustment to the Final Revenue Calculation. It is a violation of a specific APA provision governing the *operation* of the acquired businesses, the result of which inhibited the generation of additional revenues that would have counted towards Action Rentals' receiving an earnout payment.

In *Fit Tech*, for example, the First Circuit held that breach of contract and good faith and fair dealing claims were not arbitrable because they were based on the buyer's alleged "operating violations" in diverting business away from acquired company. 374 F.3d at 3, 8.[8]

---

[8] *See also Orrico*, 119 F. App'x at 900-03 (holding breach of contract claim and determination of damages not arbitrable where based on buyer's limiting certain operations of acquired company); *XL Capital*, 145 F. App'x at 384-86 (holding breach of contract claim not arbitrable where based on buyer's "misrepresentation that [a] new line [of business] would be excluded from the earnout calculation" and "evasive failure to provide" the seller with the

As in *Fit Tech*, *Orrico*, *XL Capital*, *Hodges*, and *BBCM*, Counterclaims I and II allege either "operating violations" or violations of express or implied obligations that are outside the scope of the limited accountant-arbitrator provision at issue here. Therefore, Counterclaims I and II are properly before this Court.

### 6.      Counterclaim III Is Not Arbitrable

Similarly, Counterclaim III is not subject to the accountant-arbitration provision. Counterclaim III seeks a declaration that Section 3.4(a)(iv) of the APA fixes the Contingent Payment Threshold at $35,927,611.03, as specified in the Contingent Payment Customer List. Action Rentals seeks declaratory relief because Sunbelt has recently claimed that the Contingent Payment Threshold should be adjusted upwards to $41,331,593. (Am. Countercl. ¶ 155.) This dispute turns on interpreting the APA—decidedly a lawyer's task, not an accountant's—which defines the Contingent Payment Threshold as "an amount equal to the combined Rental Revenues of Sellers and Buyer attributable to the Contingent Payment Customers during the trailing twelve (12) month period prior to the Closing, *as reflected on the Contingent Payment Customer List.*" (Am. Countercl. ¶¶ 56-57; APA § 3.4(a)(iv), Schedule 3.4(a)(ii).)

As the Fifth Circuit held in *Lone Star*, the parties did not empower the accountant-arbitrator to resolve the proper measure for the Contingent Payment Threshold because it raised a legal issue outside the accountant-arbitrator's authority. 898 F.3d at 632-35. Instead, the narrow language of the APA limits the arbitrator to resolving accounting disputes over "proposed adjustments" to the Final Revenue Calculation, and the question of the correct Contingent Payment Threshold falls under the APA's separate provision for any other disputes "arising out

---

required calculations); *Hodges*, 2008 WL 476140, at *2, 4-5 (holding breach of contract and good faith and fair dealing claims not arbitrable where based on buyer's failure to maximize sales of acquired products); *BBCM, Inc. v. Health Sys. Int'l, LLC*, C10-0086, 2010 WL 4607917, at *3-4, 8 (N.D. Iowa Nov. 4, 2010), *report and recommendation adopted*, 2010 WL 5418892 (N.D. Iowa Dec. 23, 2010) (holding breach of contract and good faith and fair dealing claims not arbitrable where buyer "fail[ed] to provide [seller] with 'accurate and detailed financial information'").

of or relating to" the APA to be heard in federal or state court. (APA §§ 3.4(d), 11.10); *see Lone Star*, 898 F.3d at 632-35.[9]

Sunbelt's attempt to distinguish *Lone Star* based on its procedural posture falls short. (Renewed Mot. at 12.) *Lone Star* addressed the proper scope of the arbitration clause and held that the interpretive question about the Contingent Payment Threshold was not arbitrable. Sunbelt's apparent suggestion that Action Rentals should be compelled to arbitrate an issue beyond the scope of the applicable arbitration clause, only then to come back to this Court to re-litigate the arbitrator's authority, is nonsense. Moreover, Sunbelt's wishy-washy suggestion that Sunbelt may change its position during arbitration is not credible. Notably, Sunbelt does not say that it *will not* contest that the Contingent Payment Threshold is what the APA says it is—$35,927,611.03. Thus, the proper interpretation of the Contingent Payment Threshold in Counterclaim III is a live, contested issue that is properly before this Court.

### B.      Counterclaim IV Is Not Moot

Counterclaim IV seeks an order directing Sunbelt to provide Action Rentals with a Closing Statement that complies with the APA. Sunbelt contends that Counterclaim IV is moot because it already provided Action Rentals with an APA-compliant Closing Statement. (Renewed Mot. at 12-14.) Action Rentals disputes that. Counterclaim IV should not be dismissed because the claim turns on a dispute of material fact that goes to the merits, not to jurisdiction.

"[W]ell-established precedent holds that claims should not be dismissed on motion for lack of subject-matter jurisdiction when that determination is intermeshed with the merits of the claims and there is a dispute as to a material fact." *ECB USA, Inc. v. Chubb Ins. Co. of NJ*, 20-20569-Civ, 2021 WL 9219658, at *2 (S.D. Fla. Nov. 15, 2021). Here, there is at least one material mixed issue of law and fact that cannot be resolved on a motion to dismiss.

---

[9] *See also Harker's Distrib., Inc. v. Reinhart Foodservice, L.L.C.*, 597 F. Supp. 2d 926, 939-42 (N.D. Iowa 2009) (accountant-arbitration clause was limited to "accounting matters" only and did not extend to questions of contract interpretation regarding the import of a schedule of customers for earnout provision).

The parties clearly dispute what Section 3.3 of the APA requires and whether Sunbelt satisfied those requirements. Sunbelt argues that its "first draft" of the Closing Statement on December 23, 2021 was adequate based on its interpretation of the APA. Action Rentals argues that the APA does not allow for "first draft" submissions of the Closing Statement. Action Rentals further contends that a "first draft" submission is incompatible with the structure of the APA, because Action Rentals cannot exercise its rights to contest the Closing Statement if it is a moving target. Resolving the parties' dispute thus "requires an interpretation of the [contract] as well as weighing of evidence" of Sunbelt's conduct to determine Sunbelt's compliance with the APA. *ECB USA*, 2021 WL 9219658 at *2 (denying motion to dismiss based on question of whether a party was insured under operative contract). Moreover, "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Cook v. Bennett*, 792 F.3d 1294, 1299 (11th Cir. 2015). If the Court agrees with Action Rentals that Sunbelt's draft statement was deficient, the Court then will be in a position to grant the relief Action Rentals seeks in the form of specific performance. In sum, Sunbelt has done nothing more than "dress up a merits question" as an issue of subject matter jurisdiction. *ECB USA*, 2021 WL 9219658, at *2. The renewed motion to dismiss Counterclaim IV should therefore be denied.

### C. Counterclaim V Is Adequately Pled and Not Precluded by the APA

#### 1. The Allegations Satisfy the *Iqbal* Standard

Sunbelt argues that Counterclaim V does not satisfy the *Iqbal* standard. (Renewed Mot. at 15-17.) The argument is meritless. The allegations easily satisfy the low bar established by Rule 8(a)(2), which only requires a pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. Pro. Sunbelt does not (and cannot) contend that the heightened pleading standard of Rule 9(b) applies.

Under Florida law, unjust enrichment has three elements: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and

(3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Group, Inc.,* 680 F.3d 1329, 1337 (11th Cir. 2012). Action Rentals alleges that it conferred a benefit on Sunbelt, *i.e.*, "unreimbursed, post-closing expenses that belonged to Sunbelt," such as "property taxes, security services, utilities, rent, mailing costs, and various other business expenses, total[ing] $1,381,569.77." (Am. Countercl. ¶¶ 130-131.) Action Rentals also alleges that Sunbelt retained the benefit, has not reimbursed Action Rentals, and that Sunbelt has been unjustly enriched. (*Id.* ¶¶ 132-133, 168-172.)

Accepting these allegations as true, as this Court must, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Counterclaim V easily satisfies Rule 8(a)(2) because all elements of the claim have been pled sufficiently. In addition, the allegations satisfy *Iqbal*'s plausibility test because that test merely requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Similar allegations in this District have been found to adequately state a claim for unjust enrichment. *See, e.g.*, *Quantum Supply B.V. v. Mercury Air Cargo Inc.*, 20-CV-25223, 2021 WL 2414161, at *4 (S.D. Fla. June 14, 2021) (holding that unjust enrichment was adequately pled because plaintiff identified costs and expenses it incurred on behalf of defendant that "fall outside of the scope of the parties' contractual agreement"). To the extent that Sunbelt wants more information about the alleged expenses, that is not a reason to dismiss the claim. Instead, "[t]he discovery process will afford [Sunbelt] the opportunity to explore the factual basis of [Action Rentals'] claims and to narrow issues . . . ." *Clearwater Consulting Concepts, LLP v. Imperial Premium Fin., LLC*, CIV 09 81042, 2010 WL 916392, at *2 (S.D. Fla. Mar. 11, 2010).

### 2.     The APA Does Not Cover All Unreimbursed Expenses

Sunbelt argues that the entirety of Counterclaim V is precluded by the existence of the APA. (Renewed Mot. at 14-15.) Sunbelt's argument mischaracterizes the allegations supporting Counterclaim V and Action Rentals' positions taken in this case.

As noted above, Counterclaim V is based on "unreimbursed, post-closing expenses that belonged to Sunbelt," such as "property taxes, security services, utilities, rent, mailing costs, and various other business expenses." (Am. Countercl. ¶¶ 130-131.) Sunbelt contends that the APA categorically precludes any unjust enrichment claim. But "the existence of a valid contract, on its own, does not bar an unjust enrichment claim where the damages alleged fall outside the scope of the contract." *See Quantum Supply*, 2021 WL 2414161, at *3.

It is true that the APA addresses issues related to post-closing rent and utilities. For that reason, Action Rentals previously sought, and reiterates its request for, leave of this Court to replead Counterclaim V *in part* to assert breach of contract for rent and utilities expenses.[10] But the allegations in the Amended Counterclaims do not suggest that Sunbelt owes Action Rentals for post-closing property taxes, security services, mailing costs, and other expenses as a function of the APA, or that those expenses are covered by the APA, and Sunbelt does not identify portions of the APA to the contrary. Therefore, Counterclaim V should not be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Sunbelt's motion to compel arbitration and dismiss the Counterclaims should be denied, and Action Rentals respectfully requests leave to amend its counter-claims to remove rent and utilities expenses from Counterclaim V and assert unreimbursed rent and utilities expenses as a breach of contract claim.

---

[10] Action Rentals did not seek to include any amendments to Counterclaim V in its First Amended Answer, Affirmative Defenses, and Counterclaims because its request for leave to amend that counterclaim remained pending before the Court. (D.E. 12, at 18-19.) Because the Court has not yet opined on Sunbelt's arguments to dismiss Counterclaim V, Action Rentals renews its request respectfully that the Court grant leave to amend Counterclaim V to remove rent and utilities from the allegations and to re-plead unreimbursed rent and utilities expenses as a breach of contract claim. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [for a party to amend its pleadings] when justice so requires."). Amendment remains appropriate here because Action Rentals has not unduly delayed in seeking the amendment, Sunbelt would not be prejudiced by an amendment, and the amendment would not be futile. *See Brewer–Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000).

Dated: December 27, 2023

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER ALAHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

By: */s/ Jason P. Hernandez*
JASON P. HERNANDEZ
Florida Bar No. 18598
jhernandez@stearnsweaver.com
BRETT M. KALIKOW
Florida Bar No. 1048719
bkalikow@stearnsweaver.com

*Attorneys for Defendants / Counter-claimants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 27, 2023, undersigned counsel filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record and parties registered via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Jason P. Hernandez*
    JASON P. HERNANDEZ

## <u>SERVICE LIST</u>

**Jeffrey T. Kucera**
K&L Gates LLP
200 S. Biscayne Boulevard Suite 3900
Miami, FL 33131-2399
305-539-3322
Fax: 305-358-7095
Email: jeffrey.kucera@klgates.com

**Alejandra Desiree Gonzalez**
K&L Gates LLP
200 S. Biscayne Boulevard Suite 3900
Miami, FL 33131-2399
305-539-3300
Fax: 305-358-7095
Email: alejandra.gonzalez@klgates.com

*Attorneys for Plaintiff / Counter-Defendant*