**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 23-21771-Civ-LEIBOWITZ/TORRES

SUNBELT RENTALS, INC.,

      *Plaintiff / Counter-Defendant,*

v.

ACTION RENTALS HOLDINGS, LLC, *et al.,*

      *Defendants / Counter-Plaintiffs.*

_____/


**REPORT AND RECOMMENDATION ON PLAINTIFF'S**
**MOTION TO COMPEL ARBITRATION AND DISMISS COUNTERCLAIMS**


      This matter is before the Court on Plaintiff's motion to compel arbitration of Counterclaims 1, 2, and 3, and to dismiss Counterclaims 4 and 5. [D.E. 40] (the "Motion").   The Motion is fully briefed.   [D.E. 45, 51].   After careful consideration of the briefing and the relevant authority, and for the reasons discussed below, Plaintiff's Motion should be **GRANTED in part** and **DENIED in part**.[1]

---

[1]    On January 4, 2024, the Honorable Darrin P. Gayles referred this Motion to the undersigned for disposition. [D.E. 50].   The case was subsequently reassigned to the Honorable David S. Leibowitz. [D.E. 64].

## I.    BACKGROUND

Plaintiff and Defendants are in the construction equipment rental business. Plaintiff sought to expand its operations by acquiring Defendants and their assets, but the process has not been frictionless.   In due course, Plaintiff instigated this lawsuit with a single breach of contract claim that stemmed from the Asset Purchase Agreement ("APA") between the parties.   [D.E. 1].   Defendants responded with five counterclaims, alleging (1) that Plaintiff breached the APA as well, (2) that Plaintiff breached its duty of good faith and fair dealing, (3) that the Court should declare the value of a "threshold" amount in the APA, (4) that Plaintiff should be compelled to perform one specific obligation under the APA, and (5) that Plaintiff has been unjustly enriched.   [D.E. 39].   Plaintiff now seeks to compel Counterclaims 1, 2, and 3 to arbitration; Plaintiff also seeks to dismiss Counterclaims 4 and 5. [D.E. 40].

The APA prescribes the processes attendant to closing the deal as well as post-closing obligations.   *See generally* [D.E. 1-1].   Relevant for our purposes, Section 3.3 provides that Plaintiff—the "Buyer"—is obligated to provide Defendants—the "Seller" or, as defined in the APA, "Bruno"—with a "Closing Statement" within 60 days of closing.   *See id*. at 18-19.   Section 7.12 similarly provides for how the Buyer is obligated to reimburse the Seller for the post-closing use of real property that remained in the possession of the Seller.   *See id*. at 41-42.   Counterclaim 4 seeks specific performance of Plaintiff's Section 3.3 obligation, and Counterclaim 5 alleges unjust enrichment tied to some of Plaintiff's Section 7.12 obligations.

The bulk of Defendants' counterclaims focus on one specific aspect of Plaintiff's post-closing obligations—a feature commonly referred to as the "earnout" payment. Section 3.4 of the APA concerns the "Contingent Payment Amount"—compensation due to Defendants in addition to the purchase price if certain post-closing revenues are accrued by Plaintiff. *See id*. at 20-22. Specifically:

3.4   <u>Contingent Payment Amount</u>.   As an additional component to the Purchase Price, the Seller Group will be eligible to receive the Contingent Payment Amount in accordance with this Section 3.4.

(a)   As used herein:

(i)   "<u>Contingent Payment Amount</u>" means an amount up to $7,500,000.

(ii)   "<u>Contingent Payment Customers</u>" means the customers of Sellers listed on Schedule 3.4(a)(ii) (the "Contingent Payment Customer List") and any New Customers.

(iii)   "<u>Contingent Period Revenues</u>" means the Rental Revenues of Buyer attributable to the Contingent Payment Customers during the Contingent Payment Period.

(iv)   "<u>Contingent Payment Threshold</u>" means an amount equal to the combined Rental Revenues of Sellers and Buyer attributable to the Contingent Payment Customers during the trailing twelve (12) month period prior to the Closing, as reflected on the Contingent Payment Customer List.

(v)   "<u>Contingent Payment Period</u>" means the 12-month period commencing on January 1, 2022.

(vi)   "<u>Rental Revenues</u>" means pure rental revenues, excluding rental related revenues such as re-rent,

transportation, fuel, damage waiver, environmental, parts, labor and sales.

(vii)   "<u>New Customers</u>" means any Person that (A) has never been a customer of Sellers or a customer of Buyer or its Affiliates prior to the Closing, (B) is introduced to Buyer by Bruno E. Ramos or any former employee of Sellers, and (C) is approved by Buyer.

(b)   During the Contingent Payment Period, Buyer (i) shall in good faith continue to provide rental services to the Contingent Payment Customers and (ii) shall not take any action that is primarily intended to prevent or frustrate the achievement of Contingent Period Revenues for the Contingent Payment Period being equal to or greater than the Contingent Payment Threshold.

(c)   Buyer will prepare and deliver to Bruno (i) within the ten (10) day period following the end of each calendar month during the Contingent Payment Period a statement setting forth in reasonable detail the Contingent Period Revenues to date through the end of the month in question and (ii) within the thirty (30) days following the end of the Contingent Payment Period, a statement setting forth in reasonable detail the Contingent Period Revenues for the entire Contingent Payment Period (the "<u>Final Revenue Calculation</u>"). Within the thirty (30) day period after Buyer's delivery of the Final Revenue Calculation, Bruno will, in a notice to Buyer, either accept the Final Revenue Calculation, or, in the event that Bruno believes the Final Revenue Calculation was not determined correctly or in accordance with this Agreement, describe in reasonable detail any proposed adjustments to the Final Revenue Calculation which Bruno believes should be made and the basis therefor. If such notice of proposed adjustments has not been delivered to Buyer within such thirty (30) day period, Bruno will be deemed to have accepted the Final Revenue Calculation. For the avoidance of doubt, Bruno's receipt and/or acceptance of the calculations presented in the interim statements delivered under subsection (i) above shall not be deemed conclusive and binding upon Bruno for

4

purposes of the Final Revenue Calculation (which shall be, as adjusted in accordance with Sections 3.4(b) and 3.4(c) if and as applicable, the sole determinant of the Contingent Payment Amount).

(d)   Buyer and Bruno will negotiate in good faith to resolve any dispute over the Bruno's proposed adjustments to the Final Revenue Calculation, provided that if any such dispute is not resolved within thirty (30) days following receipt by Buyer of Bruno's proposed adjustments, Buyer and Bruno jointly will select (or, if Buyer and Bruno are unable to agree, the American Arbitration Association will select) an Accounting Firm to resolve by arbitration any remaining dispute over Bruno's proposed adjustments. Buyer and Bruno will direct the Accounting Firm to resolve the items in dispute and render a written report on the resolved disputed items (and only on those disputed items) within thirty (30) days after the date on which it is engaged or as soon thereafter as possible. In resolving any disputed item, the Accounting Firm may not assign a value to any item greater than the greatest value for such item claimed by Buyer or Bruno or less than the smallest value for such item claimed by Buyer or Bruno.   The resolution of the dispute by the Accounting Firm will be final and binding upon the Parties except in the case of fraud or manifest clerical error, and judgment may be entered on the award. The cost of the services of the Accounting Firm will be allocated by the Accounting Firm between Buyer and Bruno (on behalf of the Seller Group) in the same proportion that the aggregate amount of such resolved disputed items so submitted to the Accounting Firm that is unsuccessfully disputed by each such Party (as finally determined by the Accounting Firm) bears to the total amount of such resolved disputed items so submitted.

(e)   The Contingent Payment Amount will be earned and paid as follows:

(i)   In the event the Final Revenue Calculation for the Contingent Payment Period (as deemed final pursuant to Sections 3.4(c) or 3.4(d)) reflects that the Contingent Period Revenues for the Contingent

5

Payment Period are equal to or greater than the Contingent Payment Threshold, then Buyer will, within five (5) days of such determination, pay to ARH and AEH in the aggregate the full Contingent Payment Amount of $7,500,000 by wire transfer of immediately available funds to the accounts and pursuant to the allocation designated by Bruno;

(ii)   In the event the Final Revenue Calculation for the Contingent Payment Period (as deemed final pursuant to Sections 3.4(c) or 3.4(d)) reflects that the Contingent Period Revenues for the Contingent Payment Period are less than the Contingent Payment Threshold but are equal to or greater than ninety-one percent (91%) of the Contingent Payment Threshold, then Buyer will, within five (5) days of such determination, pay to ARH and AEH in the aggregate a portion of the Contingent Payment Amount equal to the applicable amount set forth in the following table by wire transfer of immediately available funds to the accounts and pursuant to the allocation designated by Bruno:

| Percentage of Contingent Payment Threshold | Contingent Payment Amount |
|---|---|
| 0% – 90.99% | $0 |
| 91% – 91.99% | $750,000 |
| 92% – 92.99% | $1,500,000 |
| 93% – 93.99% | $2,250,000 |
| 94% – 94.99% | $3,000,000 |
| 95% – 95.99% | $3,750,000 |
| 96% – 96.99% | $4,500,000 |
| 97% – 97.99% | $5,250,000 |
| 98% – 98.99% | $6,000,000 |
| 99% – 99.99% | $6,750,000 |
| ≥100% | $7,500,000 |

(f)   For the avoidance of doubt, the Contingent Payment Amount will not exceed $7,500,000.

*Id.* at 20-22 (emphasis in original).

6

As indicated by Section 3.4(a), the Contingent Payment Threshold is defined at the bottom of Schedule 3.4(a)(ii) as $35,927,611.03. *Id*. at 215. The heart of the issue underlying Counterclaims 1, 2, and 3 is whether Defendants are entitled to the Contingent Payment Amount (or a percentage thereof) because the Contingent Period Revenues met or exceeded 91% of the Contingent Payment Threshold. Defendants allege that they are entitled to the money but have not been paid. Accordingly, they essentially ask the Court to declare what the Contingent Payment Threshold is and then assess whether Plaintiff has breached the APA (and/or its implied duty of good faith and fair dealing) by failing to pay the appropriate Contingent Payment Amount. Because of Section 3.4(d), however, Plaintiff submits that Counterclaims 1, 2, and 3 must be submitted to an accountant-arbitrator before the Court can properly exercise jurisdiction over these counterclaims. We discuss these arguments below.

## II.   ANALYSIS

Plaintiff first moves to compel Counterclaims 1, 2, and 3 to arbitration. We conclude below that, based upon the APA and the allegations associated with Defendants' counterclaims, some of the narrow factual issues raised by Counterclaims 1 and 2 must be resolved by an accountant-arbitrator before the Court can properly resolve Defendants' broader claims for breach of contract and breach of the duty of good faith and fair dealing. But, in contrast, Counterclaim 3 should not be compelled to arbitration because the parties have not agreed to arbitrate any of the issues raised therein.

Plaintiff next moves to dismiss Counterclaim 4 on mootness grounds.   We find Plaintiff's mootness argument unpersuasive at this phase of the litigation.   Finally, Plaintiff moves to dismiss Counterclaim 5 for several reasons and Defendants concede, at least in part, that this particular counterclaim would benefit from some substantive revision.   We are inclined to agree on that last point.   In these respects, the Motion should be GRANTED in part and DENIED in part.

### A.      *Motion to Compel Arbitration.*

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, governs the validity of arbitration agreements and "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005); *see also Am. Exp. Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) ("Under the FAA, upon motion of a party, district courts must compel arbitration of all claims subject to arbitration.") (citing *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218–19 (1985)).   Its purpose is "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is speedier and less costly than litigation." *Caley*, 428 F.3d at 1367 (citing *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998)). It generally provides for the enforceability of "a contract evidencing a transaction involving commerce."   9 U.S.C. § 2.

Notwithstanding this "liberal federal policy favoring arbitration agreements, 'the FAA's strong pro-arbitration policy only applies to disputes that the parties have

8

agreed to arbitrate.'" *Mims v. Global Credit and Collection Corp.,* 803 F. Supp. 2d 1349, 1353 (S.D. Fla. 2011) (quoting *Becker v. Davis,* 491 F.3d 1292, 1298 (11th Cir. 2008) (quoting *Klay v. All Defendants,* 389 F.3d 1191, 1200 (11th Cir. 2004))).   "[T]he FAA does not require parties to arbitrate when they have not agreed to do so . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement." *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478 (1989) (citations omitted). Parties are free to structure their arbitration agreements as they see fit and "may limit by contract the issues which they will arbitrate." *Volt Info. Sciences, Inc.*, 489 U.S. at 479.

"When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc., v. Kaplan,* 514 U.S. 938, 944 (1995).   The agreement here is founded on Florida law.   And, under Florida law, an agreement to arbitrate is enforceable if: (1) a valid, written agreement to arbitrate exists; (2) an arbitrable issue exists; and (3) the parties have not waived their right to arbitration.   *Emeric v. Florida Fine Cars, Inc.,* No. 19-cv-20987, 2019 WL 2269083, at *2 (S.D. Fla. May 28, 2019) (Gayles, J.).

## 1.   *Certain factual disputes underlying Counterclaims 1 and 2 must be submitted to arbitration.*

Here, there really is no dispute regarding the existence of a valid and un-waived arbitration agreement between the parties; the only dispute concerns the scope of the

arbitration provision in Section 3.4(d).    In our view, the unambiguous language of the APA indicates that a subset of Defendants' factual allegations in Counterclaims 1 and 2 fall within the scope of Section 3.4(d)'s arbitration provision.    Accordingly, the parties should be compelled to arbitration to resolve these facts before the Court exercises jurisdiction over the broader counterclaims.

To reiterate, Counterclaims 1 and 2 concern Plaintiff's alleged failure to pay Defendants the Contingent Payment Amount as required by the APA.    The APA prescribes Defendants' eligibility for the Contingent Payment Amount.    Section 3.4(c) required Plaintiff to furnish Defendants with a "Final Revenue Calculation" for the entire Contingent Payment Period.    [D.E. 1-1 at 20].    Upon receipt of the Final Revenue Calculation, Defendants are entitled to propose "adjustments" to Plaintiff's math.    *Id.* at 21.    If such adjustments are proposed, the parties are then obligated to negotiate in good faith regarding Defendants' proposed adjustments.    *Id.*    And if the parties cannot reach a resolution regarding Defendants' proposed adjustments, they must submit the narrow issue of Defendants' proposed adjustments to an accountant-arbitrator for a final and binding resolution of the dispute.    *Id.*; *see also id.* at 51-53 (selecting Florida law and Florida courts to resolve disputes arising from the APA, except for the arbitration provisions in Sections 3.3(b) and 3.4(d)).

So, the arbitration provision contained in Section 3.4(d) is exceptionally narrow because it concerns *only* disputes over Defendants' proposed adjustments to Plaintiff's Final Revenue Calculation.    This much is not in dispute.    We find, however, that

Defendants' pleaded allegations are founded on a factual disputes that are subject to the arbitration provision, and which must be properly adjudicated in arbitration prior to the judicial disposition of their counterclaims.   Specifically, Counterclaim 1 alleges that Plaintiff has breached its obligations under Section 3.4 of the APA by "[f]ailing to fairly, accurately, and diligently account for all rental revenues" attributable to Contingent Payment Customers.   [D.E. 39 at 32].   Under the APA, this dispute about the Final Revenue Calculation's accuracy required Defendants to (1) propose adjustments, (2) negotiate in good faith with Plaintiff regarding those proposed adjustments, and then (3) submit the remaining disputed adjustments to an accountant for arbitration.   This is the sort of narrow factual issue that the parties contracted to resolve through arbitration.

But Counterclaim 1 further alleges, among other things, that Plaintiff breached its obligations under Section 3.4 of the APA by "[f]ailing to negotiate in good faith" regarding Defendants' proposed adjustments to the Final Revenue Calculation.   *Id*. The parties clearly did not select an accountant to determine whether Plaintiff failed to negotiate in good faith; by contrast, they expressly selected the laws and courts of Florida to decide that issue.   It is therefore clear that Counterclaim 1 contains arbitrable issues, *but it does not exclusively contain arbitrable issues*.

Counterclaim 2 presents a similar overbreadth problem by alleging that Plaintiff has breached its duty of good faith and fair dealing by, for example, "failing to fairly, accurately, and diligently account for all rental revenues" attributable to

Contingent Payment Customers. *Id*. at 34. Again, this is the sort of mathematical dispute that the APA ultimately sends to an accountant-arbitrator for resolution. But that is not the only basis for liability under Counterclaim 2 because Defendants further allege that Plaintiff breached its duty of good faith and fair dealing by "failing to negotiate in good faith" to resolve Defendants' proposed adjustments to the Final Revenue Calculation. *Id*. This is not an issue for the accountant-arbitrator.

Defendants' argument in opposition to the Motion relies heavily on a Fifth Circuit case involving similar parties and issues. *See Hebbronville Lone Star Rentals, L.L.C. v. Sunbelt Rentals Indus. Svcs., L.L.C.*, 898 F.3d 629 (5th Cir. 2018). We agree that the *Lone Star* case is instructive regarding the overbreadth issue inherent in these counterclaims.

*Lone Star* is a Texas case involving the same Plaintiff, Sunbelt, who contracted with a seller that agreed to sell its construction equipment business to Sunbelt. *Id*. at 630. The contract contained an earnout provision that contemplated a similar negotiation-followed-by-accountant-arbitration framework for resolving disputes arising from the seller's proposed adjustments to the revenue calculation authored by the buyer at the conclusion of the contingent payment period. *Id*. at 630-31. The seller proposed adjusting the buyer's revenue calculation to include rentals from "COG Operating LLC" and "COG Operating, LLC" because only revenues from "COG-without-a-comma" were included in the seller's revenue calculation. *Id*. A dispute

arose as to this calculation, and it proceeded to arbitration as agreed in the purchase contract.

The accountant-arbitrator subsequently determined that rental revenues from both entities should be counted because, in fact, it was only one entity. *Id.* But the accountant-arbitrator went a step further—which was error according to the Fifth Circuit—and determined more than the dispute arising from the seller's proposed adjustment, finding that the contingent revenue threshold needed to be adjusted upward because a mutual mistake at the time of contracting caused the buyer and the seller to omit "COG-with-a-comma" from the contingent revenue threshold calculation. *Id.* at 631-32. On appeal, the Fifth Circuit determined that the accountant-arbitrator exceeded the scope of the parties' arbitration provision by adjusting the contingent revenue threshold because the arbitration provision was limited to "resolving the parties' dispute about the Revenue Calculation." *Id.* at 633.

For our purposes, *Lone Star* illustrates the narrow scope of the arbitration provision contained in Section 3.4(d), but it also demonstrates how that provision is supposed to work in practice—through arbitration of the factual issues relevant to the financial calculations themselves. Because the parties do not dispute that the APA contains a valid and un-waived agreement to arbitrate, we find that arbitration should be compelled in a limited respect for Counterclaims 1 and 2 because the parties have agreed to arbitrate some of the factual issues underlying these counterclaims. After the accountant-arbitrator has determined the resolution of Defendants' proposed

adjustments, the balance of the issues raised in these counterclaims is for this Court to resolve.

Defendants claim in their response that no relief should be granted on the motion to compel because the narrowly drawn accountant-arbitration provision is limited to adjudicating proposed financial adjustments to the Final Revenue Calculation, nothing more.   And their counterclaims have much broader significance that address how Plaintiff conducted its business operations after the sale, which are macro-contractual disputes that have nothing to do with financial adjustments.

Yet, the very same response acknowledges that its counterclaims are also about "failing to diligently and *accurately* identify and disclose all rental revenues for all accounts, locations, and subsidiaries of Sunbelt for all Contingent Payment Customers (including New Customers);" and "failing to provide Action Rentals with a Final Revenue Calculation setting forth the Contingent Period Revenues *in reasonable detail* by repeatedly providing *incomplete and inaccurate calculations* and without sufficient information for Action Rentals to exercise their contractual rights to dispute and propose adjustments to Sunbelt's calculations;" and by "repeatedly providing *incomplete and inaccurate calculations* and without sufficient information for Action Rentals to exercise their contractual rights to dispute and propose adjustments to Sunbelt's calculations[.]" [D.E. 45 at 14] (emphasis added).

So even in their response, Defendants seem oblivious to the factual disputes, highlighted in the Court's analysis above, that they seek to adjudicate in this case that

14

focus on "accurate" and "complete" financial disclosures and on "accurate" and "detailed" calculations with respect to the Final Revenue Calculation. All these failures injured Defendants, according to these Counterclaims, by impeding their ability to properly propose and resolve their adjustments to those accurate calculations. Each of these disputes are not macro-challenges to Plaintiff's business practices, but rather focus on detailed micro-failings that resulted in the broader controversy between the parties. As the Court explained earlier, the parties' agreement expressly refers those factual disputes over accurate and detailed calculations to accountant-arbitrators, who presumably know a little more than the average juror as to how to properly calculate and compose detailed and accurate financial calculations based on sales and revenue data that they are best suited to investigate and adjudicate.

In short, even their response cuts against Defendants' broader position with respect to the motion to compel. That is also not surprising given the allegations of the counterclaims themselves that expressly allege Plaintiff's liability based on its:

b. "Failing to fairly, *accurately, and diligently account* for all rental revenues for all accounts, for all locations, and all subsidiaries of Sunbelt for the Contingent Payment Customers, and instead performing such *accounting* in a manner primarily intended to prevent or frustrate the achievement of Contingent Period Revenues meeting or exceeding the Contingent Payment Threshold;

c. Failing to fairly, *accurately, and diligently account* for all rental revenues for all New Customers during the Contingent Payment Period, and instead performing such *accounting* in a manner primarily intended to prevent or frustrate the achievement of

Contingent Period Revenues meeting or exceeding the Contingent Payment Threshold;

d.   Failing to deliver to Ramos a Final Revenue Calculation setting forth the Contingent Period Revenues in *reasonable detail* within thirty days following the end of the Contingent Payment Period by *repeatedly providing incomplete and inaccurate calculations;* failing to fairly*, accurately, and diligently account* for all rental revenues for all accounts, for all locations, and all subsidiaries of Sunbelt for the Contingent Payment Customers; failing to fairly, *accurately, and diligently account* for all rental revenues for all New Customers during the Contingent Payment Period; and *failing to confirm that any such accounting constituted a true and accurate Final Revenue Calculation under the APA . . . .*

[D.E. 39 at 32] (Counterclaim 1) (emphasis added).

So, Defendants purport to be presenting a narrow contractual claim premised on Plaintiff's flawed business practices while at the same time throwing in a host of factual disputes that underlie the broader claim and focus on how inaccurate, undetailed, incomplete, and false Plaintiff's calculations turned out to be. That contradiction cannot be cast aside as mere litigation puffery. These are the allegations in the counterclaims that Defendants chose to include in their 153-paragraph breach of contract claim. These very same allegations trigger, at least in part, the arbitration agreement's resolution mechanism in the event the parties are fighting over those very same calculations.

Further, the fact that judicial litigation may still prove necessary after those challenges are adjudicated does not negate the need to compel arbitration; to the contrary, it fully supports a stay of the non-arbitrable claims until final disposition of Defendants' accounting-related challenges before the arbitrator. That was the clear

16

intent of the parties and one that we are bound to enforce.   Accordingly, insofar as Counterclaims 1 and 2 are concerned, the Motion should be GRANTED in part and DENIED in part.

### 2. *Counterclaim 3 is not arbitrable.*

Like the preceding counterclaims, Counterclaim 3 bears upon Defendants' entitlement to the Contingent Payment Amount.   But unlike the preceding counterclaims, Counterclaim 3 does not require the resolution of any arbitrable issue before it can be resolved by this Court because it merely asks the Court to declare whether the Contingent Payment Threshold is equal to $35,927,611.03 or $41,331,593.00.   Answering this question does not require an inquiry into the accuracy of Plaintiff's Final Revenue Calculation, for example, or any dispute arising from Defendants' proposed adjustments to the Final Revenue Calculation.   Indeed, as the Court in *Lone Star* found, this is the sort of question that the parties have chosen to reserve for the judiciary rather than an accountant-arbitrator.   *See Lone Star*, 898 F.3d at 634-35.   When the narrow arbitration provision of Section 3.4(d) is read in conjunction with the choice-of-law and forum-selection clauses contained in Section 11.1 and Section 11.10 respectively, it is evident that Counterclaim 3—which seeks only a declaratory judgment regarding the true Contingent Payment Threshold prescribed by the APA—falls beyond the scope of the arbitration provision. Therefore, insofar as the Motion concerns Counterclaim 3, it should be DENIED.

**B.** **_Motion to Dismiss._**

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory statements, assertions, or labels will not survive a Rule 12(b)(6) motion to dismiss. *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.; *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citation omitted). Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. *Id*.; *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

*Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449, 453 n.2 (2012). The

Eleventh Circuit has endorsed a "two-pronged approach" in applying these principles: (1) eliminate any allegations in the complaint that are merely legal conclusions; and (2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotations omitted).

Additionally, under Rule 12(b)(1), a party may move to dismiss a claim for mootness. *Muhammad v. HSBC Bank USA, N.A.*, 399 F. App'x 460, 462 (11th Cir. 2010) (explaining that the dismissal of a case as moot is properly treated as a dismissal for lack of subject matter jurisdiction). Article III of the Constitution limits the jurisdiction of the federal courts to consideration of certain "Cases" and "Controversies"; accordingly, the doctrine of mootness is derived from this limitation because an action that is moot cannot be characterized as an active case or controversy. *Adler v. Duval County School Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). A case is moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

### 1. *Counterclaim 4 should not be dismissed.*

Counterclaim 4 seeks specific performance of Plaintiff's obligation under Section 3.3 of the APA—i.e., delivery of the "Closing Statement." [D.E. 39 at 36]. Defendants allege that Plaintiff has delivered only a "draft" of the required Closing

Statement and therefore Plaintiff's noncompliance must be remedied through equitable means.  *Id.*   Accordingly, Plaintiffs respond that the "draft" they provided satisfied their obligations under the APA and therefore this claim should be dismissed under the doctrine of mootness.

This challenge to Counterclaim 4 may be well received on a motion for summary judgment, but it is ineffective at this juncture because it would require the Court to resolve an issue of fact regarding whether the "draft" Closing Statement provided by Plaintiff complies with the requirements imposed by the APA.   It is well-established that we are bound to accept Defendants' well-pled allegations as true at this juncture, and here Defendants allege that the "draft" Closing Statement does not constitute the Closing Statement contemplated by Section 3.3 of the APA.

In our view, Plaintiff's argument essentially boils down to a factual dispute regarding the merits of Counterclaim 4 rather than a challenge to the Court's subject matter jurisdiction.   *See, e.g., ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*, No. 20-cv-20569, 2021 WL 9219658, at *2 (S.D. Fla. Nov. 15, 2021) ("[W]ell-established precedent holds that claims 'should not be dismissed on motion for lack of subject-matter jurisdiction when that determination is intermeshed with the merits of the claims and there is a dispute as to a material fact.'") (quoting *PDVA US Litig. Trust v. Lukoil Pan Ams., LLC*, 991 F.3d 1187, 1191-92 (11th Cir. 2021)).   Therefore, it would be inappropriate to dismiss Counterclaim 4 as moot.   It may very well be deemed

meritless or moot at summary judgment when a full record is developed.   But for now, insofar as this aspect of the Motion is concerned, it should be DENIED.

### 2. *Counterclaim 5 should be dismissed.*

Plaintiff's final challenge has two prongs: (1) Counterclaim 5 should be dismissed because Section 7.12 of the APA precludes Defendants from suing for unjust enrichment relating to their rent and utilities expenses; and (2) Counterclaim 5 should be dismissed because it fails to plausibly state a claim upon which relief can be granted.   Defendants effectively concede to Plaintiff's first argument, but we remain unpersuaded by the second.

Defendants' central allegation is that they paid $1,381,569.77 in post-closing expenses to "ensure a smooth transition" of the business from Defendants' to Plaintiffs' control.   [D.E. 39 at ¶ 131].   These expenses are allegedly related to "property taxes, security services, utilities, rent, mailing costs, and various other business expenses" that Defendants incurred for Plaintiffs' benefit but that have not been reimbursed by Plaintiffs.   *Id.* at ¶¶ 131-32.

As a starting point, Defendants concede that the reimbursement of post-closing expenses for "rent" and "utilities" is a subject governed by Section 7.12 of the APA. [D.E. 45 at 23-24].   Recognizing that an unjust enrichment claim cannot be maintained under Florida law when an express contract governs the subject matter of the claim, *see American Marine Tech, Inc. v. World Grp. Yachting, Inc.*, 418 F. Supp. 3d 1075, 1083 (S.D. Fla. 2019), Defendants seek leave to amend Counterclaim 5 so

that they can instead recover for the unreimbursed rent and utilities under a breach of contract claim.   Given that we are still in a relatively early phase of the case, we agree that the unjust enrichment counterclaim should be dismissed and Defendants be given leave to amend their counterclaims so that this technical deficiency can be resolved.

Nevertheless, because reimbursement for post-closing property taxes, security services, mailing costs, and other various business expenses do not appear to be governed by the APA, Plaintiff separately argues that Counterclaim 5 should be dismissed in its entirety because Defendants fail to plausibly state a claim for unjust enrichment.

Under Florida law, the elements for a claim of unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof.   *American Marine Tech, Inc.*, 418 F. Supp. 3d at 1083 (citing *Henry M. Butler, Inc. v. Trizec Properties, Inc.*, 524 So.2d 710, 712 (Fla. 2d DCA 1988)).

Defendants provide a concise description of the types of expenses that generated a $1,381,569.77 benefit in Plaintiff's favor—post-closing property taxes, security services, mailing costs, utilities, rent, and other various business expenses.   We are persuaded that the counterclaim is sufficiently plausible to withstand scrutiny under *Twombly/Iqbal* and to fairly put Plaintiff on notice regarding the substance of

Defendants' unjust enrichment counterclaim.   In addition to providing a precise dollar amount, Defendants have identified the categories from which that sum derives and they have done so with the factual context of the sale of their businesses to Plaintiff.   Thus, the claim is plausible on its face.   And because Defendants have alleged an exact dollar amount comprised of expenses from only six categories, Plaintiff has a firm starting point to engage in the discovery process regarding this counterclaim.

Insofar as the Motion concerns Counterclaim 5, it should be GRANTED in part and DENIED in part.   Counterclaim 5 should be dismissed with respect to the allegation that "rent" and "utilities" comprise part of the benefit unjustly retained by Plaintiff, but Defendants should be granted leave to amend this error.   Beyond that, Counterclaim 5 should proceed to adjudication on the merits and not be dismissed on the pleadings.

### III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiff's Motion be **GRANTED in part and DENIED in part** as follows.

A.   The arbitrable factual disputes underlying Counterclaims 1 and 2 should be compelled to arbitration.

B.   Counterclaim 3 should not be compelled to arbitration.

C.   Counterclaim 4 should not be dismissed.

D.   Counterclaim 5 should be dismissed in part with leave to amend.

E.      Any non-arbitrable claims or disputes included in Counterclaims 1 and 2 should be **STAYED** pending the arbitrator's findings.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.   Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.   *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 8th day of May, 2024.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
Chief United States Magistrate Judge

24